**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **TRUMAN MCCOLLUM, Jr.** | § | |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | |
| | § | **CIVIL ACTION NO._____** |
| | § | |
| **CITY OF KILLEEN, TEXAS, EDWARD** | § | |
| **URENA, FRANKLIN MELENDEZ, and** | § | |
| **JOSHUA PLOWICK** | § | |
| *Defendants* | § | |
| | § | **JURY TRIAL DEMANDED** |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES **TRUMAN MCCOLLUM**, Jr., referred to herein as Plaintiff, Truman McCollum, or Mr. McCollum, complaining of Defendants **CITY OF KILLEEN, TEXAS** ("City") and **EDWARD URENA** ("Officer Urena" or "Urena"), **FRANKLIN MELENDEZ** ("Officer Melendez" or "Melendez"), and **JOSHUA PLOWICK** ("Officer Plowick" or "Plowick") in their individual capacities, hereinafter called Defendants, and for cause of action, would respectfully show unto the Court and jury the following:

> *"Potentially, a government is the most dangerous threat to man's rights: it holds a legal monopoly on the use of physical force against legally disarmed victims."*
> — **Ayn Rand**

## I. NATURE OF THE CASE

**THE CLAIM:** CITY OF KILLEEN, TEXAS officers Edward Urena, Franklin Melendez, and Joshua Plowick used excessive force against Truman McCollum, Jr., in violation of his individual rights under the Fourth Amendment to the United States Constitution when they illegally detained him on January 16, 2021, tasing him six (6) times and causing immense pain, when they

had no legal authority to use any force whatsoever. In the alternative, Defendants also violated Mr. McCollum's Fourth Amendment right to be free in his person/bodily integrity from unlawful intrusion and seizures of his person when repeatedly tasing him as their means to force medical treatment upon him to which he could not consent, comply, make informed decisions, remain still, or follow their instructions due to the severity of his medical condition and prolonged repeat tasing, actually escalating Mr. McCollum's confusion and resulting medical combativeness.

This violence was caused by CITY OF KILLEEN, TEXAS policies, customs, or practices with respect to the use of force on unarmed suspects and failure to train officers on the signs, symptoms, and recovery of and from seizures, with particular focus on the postictal state experienced by one who has just endured a seizure. Mr. McCollum's injuries resulted directly and only from this clearly excessive use of force; and the excessiveness of that force was clearly unreasonable. The actions alleged herein are of such a nature as to shock the conscience and are cruel and unusual in their oppressiveness.

## II.  **PARTIES**

1. Plaintiff, **TRUMAN MCCOLLUM, JR.,** is a resident of the city of Killeen, TX.
2. Defendant CITY OF KILLEEN, TEXAS is a political subdivision of the State of Texas and the City of Killeen Police Department is an agency operated thereunder.
3. The City of Killeen Police Department is funded and operated by the City of Killeen City Council. The Honorable Debbie Nash-King is the mayor of the City of Killeen and Mr. Kent Cagle is the city manager of the City of Killeen.
4. Mayor Nash-King and Mr. Cagle are responsible for implementing the policies and decisions of the City of Killeen City Council as the City's primary administrators.
5. Mayor Nash-King, Mr. Cagle, and the City Council are tasked with appropriating, reviewing, and implementing the City of Killeen Police Department's budget, policies, procedures, practices, and customs, including the acts and omissions related thereto, at issue in this lawsuit.
6. Mr. Charles F. Kimble is the Chief of Police of the City of Killeen and the primary policymaker tasked with creating, implementing, and reviewing the City of Killeen Police Department policies, procedures, practices, and customs.
7. City of Killeen may be served by and through Mayor Nash-King at the City of Killeen City Hall, 101 N. College Street, Killeen, TX 76541, or wherever she may be found.

8.  Defendant **EDWARD URENA** is a police officer employed by the CITY OF KILLEEN, TEXAS and at all times material herein was a police officer acting in the course and scope of his employment for the City of Killeen, TX. He may be served at his place of employment at the CITY OF KILLEEN, TEXAS located at 3304 Community Blvd., Killeen, TX 76542, or wherever he may be found. Defendant Williams is being sued in his individual capacity.

9.  Defendant **FRANKLIN MELENDEZ** is a police officer employed by the CITY OF KILLEEN, TEXAS and at all times material herein was a police officer acting in the course and scope of his employment for the City of Killeen, TX. He may be served at his place of employment at the CITY OF KILLEEN, TEXAS located at 3304 Community Blvd., Killeen, TX 76542, or wherever he may be found. Defendant Williams is being sued in his individual capacity.

10. Defendant **JOSHUA PLOWICK** is a police officer employed by the CITY OF KILLEEN, TEXAS and at all times material herein was a police officer acting in the course and scope of his employment for the City of Killeen, TX. He may be served at his place of employment at the CITY OF KILLEEN, TEXAS located at 3304 Community Blvd., Killeen, TX 76542, or wherever he may be found. Defendant Williams is being sued in his individual capacity.

## III.   JURISDICTION

11. The subject matter in controversy and damages sought are within the jurisdictional limits of this Court.

12. This Court also has jurisdiction over this suit under 42 U.S.C. § 1983.

13. Venue is also appropriate in the Western District of Texas pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in Killeen, Bell County, Texas, which is in the Waco Division of the Western District of Texas.

## IV.   FACTS AND ALLEGATIONS

14. In November of 1977, Truman McCollum, Jr., was born into a family committed to public service, and particularly in service to our nation's Armed Forces. His wife is in the Army Reserve. His sister is an Army veteran, nurse, and lawyer. His oldest sister is retired Army and the reason he moved to Killeen, as she was stationed at Fort Hood. His older cousins

are retired Army, having served in multiple combat tours. His late father was in the Navy. Every day of Truman's life, he has been raised, poured into, modeled to, loved by, and guided by those who have routinely given their best of service and sacrifice.

15. On January 16, 2021, Truman McCollum, Jr. had his constitutional rights violated when he was illegally detained and tased excessively by Officers Edward Urena, Franklin Melendez, and Joshua Plowick of the CITY OF KILLEEN, TEXAS.

16. The incident was captured on Defendant Urena's body camera device. All quotes attributed to Mr. McCollum, Defendants, or others on scene are sourced from Defendant Urena's body worn camera or the body worn camera footage captured by Officer Yost of the Killeen Police Department.

17. At approximately 1700 on January 16, 2021, Defendants were dispatched to a Burger King restaurant located at 3809 E. Stan Schlueter Loop in the city of Killeen in reference to an auto accident that had occurred in the drive thru lane, wherein the employee verbally described to the police upon arrival that one of the drivers – later identified as Truman McCollum  - had a seizure while sitting in his car in the drive thru.

18. Upon Defendant Urena's arrival, he made contact with one of the Burger King employees who was near one of the vehicles — a gray Dodge Challenger — which had been involved in the accident, as evidenced by the front-end damage visible on the vehicle and the deployed airbags.

19. One of the Burger King employees, J.K., wrote a written statement about the accident and provided it to the Killeen Police Department.

ON 21 JAN AROUND 4:56pm the customer in the Dodge Challenger placed his order and pulled around. He stopped about a car length from the Ram infront of him. After about 1.5 min, his car accelerated quickly into the back of the truck. He suddenly stopps, hit the truck again and pushes the truck to the end of the lane. I arrived to his car with airbags deployed, radio very high, and car in drive. I placed car in park and turned off radio. Tried to talk to him with no response. Waited till 911 arrived

(ILLUSTRATION A)

20. Defendant Urena observed that the Dodge Challenger that had been involved in the accident was occupied by a gentleman later identified as Truman McCollum. Mr. McCollum was unconscious at the time of Defendant Urena's arrival. Both airbags in Truman's car had deployed.

21. Defendant Urena then contacted Mr. W.F., the gentleman whose Dodge Ram was rear-ended by the Challenger. Later during his time on scene, Defendant Urena was apprised that the driver of the Dodge Challenger was "flailing his arms…and listening to music" and hit him twice from behind as he was ordering his food in the drive thru.

22. Sometime during Defendant Urena's contact with W.F., Defendants Melendez and Plowick arrived on scene to assist with the call.

23. Defendant Plowick noted in his supplement report that Mr. McCollum "appeared incoherent opening his eyes slightly but completely unresponsive to commands and stimuli. Truman made no attempts to exit the vehicle and was completely unresponsive when pulled from the vehicle by EMS."

24. Killeen FIRE-EMS removed Mr. McCollum from his vehicle and put him onto a stretcher to be transported to the ambulance on scene, Medic 6.



(ILLUSTRATION B)

25. During his transport to Medic 6, Mr. McCollum was not detained, handcuffed, or otherwise restrained in his liberty, save from being strapped to the medical gurney, indicating that he was not in custody at this juncture.

26. As Mr. McCollum was transported to the ambulance, Defendants Melendez and Urena, on information and belief, discussed the fact that the Burger King staff had informed Defendant Urena that they believed Mr. McCollum had suffered a seizure, which caused the accident with W.F.

27. Defendant Plowick then went inside to attempt to retrieve the surveillance footage of the accident. In the meantime, Defendant Urena spoke with W.F. at his truck, discussing his injuries and how the accident occurred.

28. At this time, none of the Defendants or any other officer expressed that Mr. McCollum was being detained or under arrest on suspicion of having committed a criminal offense.

29. When Defendant Urena concluded his conversation with W.F., he headed towards Medic 6.

30. In the meantime, paramedics transported Mr. McCollum to the ambulance, where he began to gradually awake in a confused state once inside the ambulance, "asking where he was," as noted by Defendant Melendez.

31. Still confused, not knowing where he was or the circumstances to which he'd awakened restrained to a bed as opposed to his last known position of being in his car, Mr. McCollum began trying to get up off the gurney.

32. At no time was he threatening or menacing the paramedics or the City of Killeen police officers.

33. As Defendants attempted to force him to remain on the gurney, Mr. McCollum --- who is 6 foot 3 inches tall and was still confused — merely struggled to establish his footing in that small space.  To wit,  City of Killeen PD Officer Mascarenas noted in his report that "[i]t appeared that McCollum was attempting to stand up…"

34.  At this point and at no point during these events transpiring in the ambulance did either of the Defendants make Mr. McCollum aware that they were attempting to detain or arrest him.

35. At this point and at no point during these events did either of the Defendants have probable cause or arguable probable cause to detain or arrest him.

36. Without cause or any aggression displayed by Mr. McCollum, Defendant Melendez then requested that Defendant Urena "use his department-issued XP26 Taser to gain compliance from [Mr. McCollum]."

37. In Defendant Urena's body worn camera ("BWC") capturing the event, Defendant Melendez is heard saying "Get your taser! Get your taser!" as Defendants Melendez and Plowick slam Mr. McCollum down onto the gurney.

38. Defendant Urena did just that: got his taser and tased Mr. McCollum_**, brutally**, approximately six times._

39. The first time, Defendant Urena tased Mr. McCollum in his lower back.



(ILLUSTRATION C)

40. After the first deployment of the taser, Mr. McCollum shrieks in pain and falls off the gurney to the floor of the ambulance. He is obviously bewildered and trying to gain his bearings.



(ILLUSTRATION D)

41. Mr. McCollum is now lying supine on the ground and ***very obviously*** not attempting to assault or attack any of the Defendants or paramedics.

42. Notwithstanding this, Defendant Urena continues barking orders: "Let me see your hands! Turn around, turn around! Get on your stomach." Mr. McCollum in pain and with fear in his eyes, is clearly desperately trying to figure out what's going on.

43. Defendants then yank Mr. McCollum up off of the floor of the ambulance and sit him up. In the meantime, Mr. McCollum, clearly in distress, is attempting to comply, saying "Ok, man…come on, man…please…"



(ILLUSTRATION E)

44. Defendants continue to instruct him to "Stop!" as Mr. McCollum is merely trying to sit up.

45. As Defendants Plowick and Melendez sit Mr. McCollum up, Defendant Urena readies to deploy his taser again, placing it in Mr. McCollum's back before activating it once more. A few seconds later, Defendant Urena tases Mr. McCollum a second time.





(ILLUSTRATIONS F-G)

41. Mr. McCollum begins shrieking as he feels the electricity of the taser once more. As Defendants Plowick and Melendez restrain his arms, Defendant Urena readies to tase him <u>for a third time</u>.

42. Defendant Urena then tases Mr. McCollum a third time in his back.



(ILLUSTRATION H)

42. Defendant Urena then tases Mr. McCollum <u>a fourth time</u> as he is restrained by Defendants Melendez and Plowick.



(ILLUSTRATION I)



(ILLUSTRATION J)

43. As Defendant Urena is <u>tasing Mr. McCollum for a fourth time</u>, Defendant Melendez can be heard yelling "Watch that taser!" as Mr. McCollum is heard screaming in pain.

44. Mr. McCollum is still shrieking in pain as the officers continuing manhandling him. As Mr. McCollum tries to regain stability, reaching out with his hands to brace himself, Defendant Urena threatens him: "You gon' get it again!" and places his taser on Mr. McCollum's arm.



(ILLUSTRATION K)

45. Defendant Urena <u>then tased Mr. McCollum a fifth time</u> in his buttocks.



(ILLUSTRATION L)

46. Mr. McCollum is still screaming out in pain and pleading with the officers. Defendants continue to give him commands to show his hands.



(ILLUSTRATION M)

47. As Defendants Plowick and Melendez handcuff Mr. McCollum, <u>Defendant Urena tases him for a **sixth** time.</u>



(ILLUSTRATION N)

48. Defendants Plowick and Melendez handcuff Mr. McCollum as Defendant Urena rests his taser on one of the seats in the ambulance.



(ILLUSTRATION O)

49. Defendants Melendez and Plowick then complete handcuffing Mr. McCollum. Defendant Melendez can be heard exclaiming "Got him!" as this process is completed.

50. Officer Mascarenas joins Defendants and attempts to talk calmly to Mr. McCollum and help him calm down. He is the first of the officers on the scene to do so.



(ILLUSTRATION P)

51. Defendants and Officer Mascarenas then raise Mr. McCollum up and remove him from the ambulance, at which point he is forcibly walked to a police car several feet away by Defendant Melendez and others.



(ILLUSTRATION Q)

52. Once Mr. McCollum and the officers reach the police cruiser, he is put on the hood of the car and searched. Still confused and afraid, Mr. McCollum can be heard saying "Help me, please!" as the officers continue restraining him.



(ILLUSTRATION R)

53. As Mr. McCollum is being placed in the car, Defendants Melendez and Urena share a laugh as Defendant Melendez says, "You tased him like fucking six times!...You got me!" Defendant Urena, laughing, asks, "I tased you?!" Mr. McCollum can be heard screaming in distress in the background inside the back seat of the police car after an officer leans in and tases him again.



(ILLUSTRATION S)

54. Defendant Melendez replies, "Yes!"

55. Defendant Urena: "What?!"

56. Defendant Melendez: "Yeah, I'm like 'Aww fuck!'"

57. Defendant Urena laughs and replies, "Oh shit!"

58. As officers are preparing to transport Mr. McCollum, Defendants Plowick and Melendez are discussing the accident. An employee from Burger King comes out of the restaurant and shows Defendants Plowick and Melendez footage of the accident on the device in his hand, saying "I zoomed in on another shot, and it looked like he started seizing. He starts shaking."



(ILLUSTRATION T)

59. Defendants Plowick and Melendez continue discussing the accident. Plowick states, "You see him shaking and twitching inside the car, and then 'BOOM!'…he accelerates. I love it."

60. Officer Gowers with the City of Killeen PD goes to talk to W.F. regarding the accident. As he's speaking to him, Defendant Urena is regaling Officer Yost with the story that he "apparently, I tased Melendez like six times," laughing as he recounts the struggle.



(ILLUSTRATION U)

61. A few minutes later, Defendants Urena and Plowick are talking about the incident with Sgt. Mathews, who had since arrived on scene.

62. Sgt. Mathews instructs Defendant Urena on the following: "So, you need to come in as soon as possible so you can do your report and you need to do the taser…You gotta do a report for an arrest where y'all just got into a fight."

63. Defendant Plowick begins walking away, headed to a police car. Defendant Urena, unsure of what charge is appropriate, asks, "So, we're doing resisting?," to which Defendant Plowick responds, "I mean, that's the best you got right now…Ask Sarge (referring to Sgt. Mathews)."

64. Defendant Plowick continues: "The only issue I see with charging him with resisting is…how are you gonna articulate he's coherent enough to understand you're the police?...'Cause he's **not**."

65. Sgt. Mathews then states the following: "Right. So, this is what I'm trying to say: What criminal offense do we have to arrest him? Because obviously, he's already gone. So, what criminal offense do we have? 'Cause we didn't come out here…we came out here for an accident, correct?

66. Defendant Urena: "Correct."

67. Sgt. Mathews: "So, we came out here for an accident and then we find out that there's a man who's possibly seizing, but we're not sure."



(ILLUSTRATION V)

68. Thereafter, Sgt. Mathews, Defendants Plowick and Urena, and other officers discuss how to try and substantiate a DWI charge, but are clearly uncertain on what, *if any*, criminal charge they can arrest Mr. McCollum for.

## V.
## CAUSES OF ACTION

### COUNT ONE
### EXCESSIVE FORCE
### Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983 Against Defendants Urena, Melendez, and Plowick

69. Mr. McCollum repeats and re-alleges each and every allegation contained in the above paragraphs as though fully delineated below.

### *Resisting Arrest: The Law*

70. Codified under Section 38.03 of the Texas Penal Code, the law on resisting arrest is as follows:

> **(a) A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction *from effecting an arrest, search, or transportation of the actor* or another by using force against the peace officer or another.** Tex. Pen. Code, §38.03 (1994) (emphasis added).

71. For clarity, reasonable suspicion "must be supported by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion…The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized…'hunch.'" *Goodson,* at 736 (citing *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc)).

72. Probable cause, by contrast, "is present when the totality of the circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Id.*, at 740 (citing *Vance v. Nunnery*, 137 F.3d 270, 276 (5th Cir. 1998 (quoting *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996)).

73. Accordingly, Defendants Melendez, Plowick, and Urena had no reasonable suspicion to detain Mr. McCollum for any crime or probable cause to arrest Mr. McCollum for Resisting Arrest because they were not attempting to arrest, search, or transport Mr. McCollum when they initially made contact with him in the ambulance. They also had no reasonable suspicion that he had committed this crime, as no such prior attempted detention or arrest had occurred.

74. Defendants also had no probable cause or reasonable suspicion to detain or arrest Mr. McCollum on suspicion of driving while intoxicated (DWI). Upon arrival on the scene ***and throughout the entirety of their time on scene***, Defendants heard from at least two Burger King employees and the other party in the accident, W.F., that Mr. McCollum had likely suffered a seizure (and was "flailing his arms). Defendants made no independent observations — e.g. observing the odor of alcohol — consistent with Mr. McCollum being intoxicated to justify detention or arrest on such offense. While officers did locate a prescription bottle bearing Mr. McCollum's name, they were presented with no information beyond that he likely suffered a seizure, with Defendant Plowick pointing out to Defendant Melendez Mr. Collum "shaking and twitching" in the car prior to the accident.

75. Defendants Urena, Melendez, and Plowick, acting under color of law, deprived Mr. McCollum of the rights and privileges secured him by the Fourth and Fourteenth Amendments to the United States Constitution to be free from illegal and unreasonable seizures by the use of force, to wit: restraining and tasing Mr. McCollum **six times** during an illegal detention and/or arrest, as there was no reasonable suspicion or probable cause for either developed by Defendants.

76. Accordingly, Mr. McCollum commences this action pursuant to 42 U.S.C. § 1983.

77. "In order to present a successful claim of excessive force under § 1983, the plaintiff must show (1) an injury; (2) that resulted directly and only from a use of force that was excessive to the need of force; and (3) that the use of force was unreasonable under the circumstances." *Sullivan v. Allred,* 297 Fed. Appx. 339, 342 (5th Cir. 2008) (citing *Ramirez v. Knoulton,* 542 F.3d 124, 128 (5th Cir. 2008), *Bush v. Strain,* 513 F.3d 492, 501 (5th Cir. 2008), and *Freeman v. Gore,* 483 F.3d 404, 416 (5th Cir. 2007) (citing *Tarver v. City of Edna,* 410 F.3d 745, 751 (5th Cir. 2005)(see also *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)).

78. Mr. McCollum was unquestionably injured in his Draconian and excessive tasing and restraint by Defendant. His injuries were visible, on scene, to the Defendants, particularly as they were coupled with ear-piercing shrieks of pain. As the Fifth Circuit has opined, "the eggshell skull rule is applicable in 42 U.S.C. § 1983 cases," recognizing that "a tortfeasor [ — here, Defendant Williams —] takes his victim as he finds him." *Darden v. City of Fort Worth, Texas,* 880 F.3d 722, 731 (5th Cir.), *cert. denied sub nom. City of Fort Worth, Tex. v. Darden,* 139 S. Ct. 69, 202 L.Ed. 2d 23 (2018). (citing *Dunn v. Denk,* 54 F.3d 248, 251 (5th Cir. 1995), *rev'd on other grounds* 79 F.3d 401 (5th Cir. 1996) (en banc); *see also Koch v. United States*, 857 F.3d 267, 274 (5th Cir. 2017).

79. In fact, when Mr. McCollum was booked into the Bell County Jail, the **jailers** there took the following photos to memorialize the injuries he suffered in the attack by Defendants:







(ILLUSTRATIONS W-GG)

80. With respect to the injury, significant injury is not required, per se; however, the injury must be "more than de minimis." *Hanks v. Rogers*, 853 F. 3d 738 (5th Cir. 2017), (citing *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005) (citing *Harper v. Harris County, Tex.*, 21 F.3d 597, 600 (5th Cir. 1994)), but "the injury must be more than *de minimis*," (citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir.1999)).

81. Mr. McCollum' injury resulted directly and only from a use of force that was excessive to the need of force, to wit: being tased incessantly when he was not posing any threat to Defendants or the EMS personnel, and was *visibly and obviously* unarmed.

82. The excessiveness of the force was clearly unreasonable, particularly considering Mr. McCollum was not only not posing a threat to Defendant, but was literally just trying to get off of the gurney in the ambulance when he was accosted. He was not taking any aggressive stances, movements, or actions when Defendants decided to unjustifiably restrain him forcefully and tase him one, two, three, four, five, and six times in that small, confined space.

83. "The relationship between the need and the amount of force used" must be considered and assessed by the officers using force to "effectuate [a] subject's compliance." *Newman v. Guedry,* 703 F.3d 757, 763 (5th Cir. 2012) (quoting *Deville v. Marcantel,* 567 F.3d 156, 167 (5th Cir. 2009) (see also, *Hanks v. Rogers*, 853 F. 3d 738 (5th Cir. 2017)).

84. ***An officer tasing, striking, or otherwise violently slamming an arrestee who is not actively resisting arrest is a constitutional violation.*** *Darden v. City of Fort Worth, Texas,* 880 F.3d 722, at 731 (5th Cir.), *cert. denied sub nom. City of Fort Worth, Tex. v. Darden,* 139 S. Ct. 69, 202 L.Ed. 2d 23 (2018) (emphasis added).

85. Fifth Circuit case law establishes that the degree of force an officer can employ is reduced when an arrestee is not actively resisting arrest. *Id.*

86. Mr. McCollum was not actively, passively, or otherwise resisting arrest when forcefully restrained and tased repeatedly, particularly because he was neither being detained nor under arrest.

87. In determining whether the officer's use of force was "objectively reasonable," courts utilize a three-factor test outlined in the seminal Supreme Court case *Graham v. Connor:*

   a. *Severity of the crime;*

   b. *Immediate threat;* and

   c. Whether the subject is *actively resisting* or *attempting to evade arrest by fleeing. Graham v. Connor,* 490 U.S. 386, 396 (1989).

88. Analyses surrounding whether a particular use of force was objectively reasonable require "a careful balancing of the nature and quality of the intrusion on the individual's…interests against the countervailing governmental interests at stake…[requiring] careful attention to the facts and circumstances of each particular case." Seth Stoughton, et al., Evaluating Police Uses of Force (2020) (citing *Graham v. Connor*, at 396).

89. "Reasonableness" is judged from the perspective of a *reasonable officer on the scene*, as opposed to with the "20/20 vision of hindsight." *Ibid* (citing *Graham v. Connor*, at 396)(emphasis added).

90. Under *Graham,* courts are charged to rely on what a "reasonable officer" would have perceived, irrespective as to whether the officer *actually* perceived it that way. *Ibid* (citing *Graham v. Connor*, at 396).

91. As to the three elements of the *Graham* objective reasonableness test, ***none*** of the three factors is satisfied in favor of Defendant.

92. At the point Defendant Urena perceived Mr. McCollum, he was merely being addressed by EMTs. He had not been *accused* of a crime; *implicated* in a crime; *suspected* of having committed a crime. As such, there is ***no*** severity of any crime because no crime whatsoever had been committed.

93. Consequently, no force ***whatsoever*** was justified. However, ***even if*** Mr. McCollum had committed resisting arrest or even driving while intoxicated (DWI) — both misdemeanor under Texas law and in the instant case — the Fifth Circuit has said that the "severity" factor of *Graham v. Connor* "militated against the use of force where the alleged crime was a misdemeanor," rendering Defendants' use of force wholly unjustified and excessive. *Reyes v. Bridgwater*, 362 F.App'x 403, 407 n.5 (5th Cir. 2010).

94. The other two factors, however, also weigh heavily against Defendants Urena, Melendez, and Plowick.

95. Mr. McCollum was not an immediate threat, as he was laying on the EMTs' gurney and simply removing the straps and leads to the heartrate monitor. He made no motions to harm any of the Defendants or the EMTs and was visibly unarmed. He did not even verbally berate, disrespect, or raise his voice to Defendanst. He was clearly confused throughout the entire encounter and trying to end the pain he was experiencing from the brutality of the repeated tasing.

96. Mr. McCollum was also not actively or passively resisting Defendant or attempting to flee or evade arrest. Even after Defendants began attempting to affect his detention, Mr. McCollum did not fight or resist them, he merely tried to stand up, as was evident to Officer Mascarenas, a *reasonable officer on the scene* who did not find that force was appropriate, as evidenced by his lack of use of force. Mr. McCollum was most certainly not attempting to flee either.

97. The fact that no crime had been committed or even suspected and Mr. McCollum was not a threat whatsoever makes it clear that Defendants' belief that force was needed and the accompanying use of force were completely unreasonable and the force completely excessive. As the Fifth Circuit opined in *Hanks*, "a reasonable officer on the scene would have known that suddenly resorting to physical force as [Defendants Urena, Melendez, and Plowick] did would be clearly excessive and clearly unreasonable." *Hanks*, at 745.

98. The *Hanks* court opined further, noting "…clearly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance…" *Id.*, at 747.

99. Mr. McCollum suffered physical injury, pain, mental anguish as a direct result of the excessive force used against him.

100. Defendants Urena, Melendez, and Plowick caused Mr. McCollum to endure extraordinary pain and suffering by forcefully restraining him, manipulating his limbs forcefully, and tasing him at least _**six**_ times as he tried to gain his bearings in the back of the small space of the ambulance.

101. These injuries were only caused by this forceful restraint, manipulation, and tasing, and not by any other means.

## COUNT TWO

## Fourth Amendment § 1983 *Monell* Claim against Defendant CITY OF KILLEEN, TEXAS

102. Plaintiff incorporates by reference all of the foregoing and further alleges the following:

103. The conduct of Defendants Urena, Melendez, and Plowick constituted unlawful, unreasonable excessive force against Mr. McCollum without legal cause or justification.

104. At all material times, Defendants Urena, Melendez, and Plowick acted under color of state law, as agents of the CITY OF KILLEEN, TEXAS.

105. Defendants were acting within the course and scope of their duties as CITY OF KILLEEN, TEXAS officers when they brutally restrained, slammed, and tased Mr. McCollum. At all times relevant to this lawsuit, Defendants Urena, Melendez, and Plowick ere clad in their CITY OF KILLEEN, TEXAS-issued uniforms.

106.     Chief Charles F. Kimble was and is the Defendant's policymaker for all matters related to the CITY OF KILLEEN, TEXAS, having been delegated the policymaking authority by the City of Killeen, Texas City Council.

107.     Consequently, the City of Killeen, Texas had or ratified the following policies, customs, and/or practices in place when Defendants Urena, Melendez, and Plowick attacked Mr. McCollum:

**Policy, Custom, or Practice #1**: The City of Killeen, Texas has a policy, custom, or practice of using violent, non-lethal force to seize a person, even when that person is not an imminent threat. **This policy caused injury to Truman McCollum because Defendants Urena, Melendez, and Plowick assaulted him pursuant to this policy, custom, and/or practice. Delineated below are several examples of this policy, custom, and/or practice:**

1.     **Civil Action No. 1:10-cv-00338 – _Copeland v. City of Killeen and Adam Ortiz:_** In this complaint, a mother's son was in a fight with another child. She and her son went to the other child's home to confront him and his family, on information and belief. A City of Killeen, Texas officer (or multiple officers) rushed towards her child. The mother was pepper sprayed and handcuffed roughly, and her arms were twisted behind her back.

2.     **Civil Action No. 6:17-cv-00328 – _Bell v. Lundt, Frucella, and City of Killeen:_** In this complaint, J.W., a high school student, was forcibly removed from a school bus after having been assaulted on the bus. The young man was body slammed by City of Killeen officers.

3.     **Civil Action No. 6:12-cv-00163 – _Stanley v. City of Killeen:_** In this complaint, the plaintiff was arrested for PI (public intoxication).  The plaintiff was attacked without justification upon arrival at the Killeen City Jail, sustaining injuries to their legs, knees, tendons, ligaments, muscles, and bones.

4.     **Civil Action No. 6:16-cv-00323 – _Smith v. City of Killeen and Givonchie Evans:_** In this complaint, a gentleman was shot and killed by a City of Killeen police officer after evading in a motor vehicle.

5. On information and belief, a man was shot by a stun gun in North Killeen on May 10, 2022. A cell phone video of the incident was shot by Cluren Williams, a local activist. This incident took place at 1801 N. College St. in Killeen.

6. On information and belief, Patrick Lee Warren, an unarmed man with mental health issues, was shot and killed by City of Killeen Officer Reynaldo Contreras on January 10, 2021.

**Policy, Custom, or Practice #2**: The City of Killeen, Texas has a policy, custom, or practice of not requiring City of Killeen police officers to undergo training to recognize the postictal state which follows seizures. **This policy caused injury to Truman McCollum because Defendants Urena, Melendez, and Plowick mistook his medical symptoms as noncompliance and brutally restrained, slammed, and tased him pursuant to this policy, custom, and/or practice.**

108. Chief Kimble and his command staff were all deliberately indifferent to the natural byproducts of this policy, practice, and/or custom, of which he was aware, authorized, ratified, accepted, exacerbated, and encouraged, instead of rectifying it and ensuring civilians were not hurt by it.

109. It was clear that a constitutional violation was a very likely outcome of the ratification, adoption, and promotion of these policies.

110. Chief Kimble and his command staff knew or should have known that both the use of force against unarmed citizens not posing an immediate threat and a policy of not requiring City of Killeen officers to receive training in seizures and the postictal state following a seizure would result in citizens being subjected to unjustifiable and excessive force and/or having the known symptoms of the aftermath of a seizure mistaken for noncompliance.

111. These policies, *supra*, were actually known, constructively known, and/or ratified by the City of Killeen and its policymakers, including Chief Kimble, and was promulgated with deliberate indifference to Mr. McCollum' rights under the United States Constitution and the rights of all others making contact with City of Killeen officers. The policymakers of the CITY OF KILLEEN, TEXAS knew that their officers would continuously be put in situations wherein constitutional violations like those aforementioned in this complaint would occur. These policies made it highly likely that such constitutional violations as those previously described would occur, under color of state law. The previously

mentioned policies were a moving force of Mr. McCollum' constitutional deprivations and injuries, causing him to experience physical and mental injury and suffer damages.

### Qualified Immunity under § 1983

112.     City Employees may be entitled to qualified immunity as to their individual liability. That immunity is waived, however, upon a showing by the Plaintiff that:

a.     The individual's acts deprived the party of constitutional rights under color of law;

b.     The deprived rights were clearly established, constitutional rights in existence at the time of the acts complained of; and

c.     Such acts were not objectively reasonable under the circumstances, that is, no reasonable official could have believed at the time that the conduct was lawful.

113.     "In 'an obvious case,' [*Graham v. Connor*] and [*Tennessee v. Garner*] may supply the "clearly established law." *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (citing *Mullenix v. Luna*, 136 S.Ct. 305, 308, 193 L. Ed. 2d 255 (2015)) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (*per curiam*)); *see also Cooper*, 844 F.3d at 524. This case is an obvious case of excessive force and violation of the Fourth Amendment right against unreasonable searches and seizures, because Mr. McCollum was not suspected of committing any crime; Defendant had developed no reasonable suspicion that he had committed a crime; and Defendant had developed no probable cause to arrest him for a crime, making the force used completely unjustifiable.

114.     Defendants Urena, Melendez, and Plowick, acting under color of state law, enforcing the policies, customs, and/or practices of the CITY OF KILLEEN, TEXAS, deprived Mr. McCollum of his civil liberties, without due process of law, by assaulting him unlawfully and unreasonably with clearly excessive force.

115. The Fifth Circuit has, in denying qualified immunity for officers, "placed weight on the quickness with which law enforcement personnel have escalated from negotiation to force." *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016). The Court opined further to that end in the *Hanks* case, noting that "our case law clearly established that [the officer] should have continued to verbally negotiate — including by threatening force, if necessary — rather than abruptly resorting to 'actual' physical force." *Hanks*, at 748.

116. No reasonable official could have believed that assaulting Mr. McCollum while he was obviously confused and in a postictal state, was in any way humane or remotely appropriate.

"Any reasonable officer should have realized that [Defendants Urena, Melendez, and Plowick's] unlawful, unreasonable assault, illegal detention, and tasing of Mr. McCollum] offended the Constitution." *Taylor v. Riojas*, 141 S.Ct. 52, at 54 (2020).

117. The Fifth Circuit has also recognized a citizen's right to be free from unlawful restraint in *Trammel v. Forge*. In that case, the court instructed that the "central concept [with respect to qualified immunity] is that of 'fair warning:' the law can be clearly established 'despite notable factual distinctions' between the precedents relied on and the case then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Trammel v. Forge*, 868 F.3d 332, 339 (5th Cir. 2017).

118. The acts of Defendants Urena, Melendez, and Plowick were unreasonable under the circumstances when viewed objectively.

119. Defendants Urena, Melendez, and Plowick were deliberately indifferent to the excessive risk of harm to Mr. McCollum in the actions they took. Such acts deprived Mr. McCollum of and violated his clearly established constitutional rights and were not objectively reasonable.

120. The acts of Defendants Urena, Melendez, and Plowick clearly violated established rights under the Constitution and statutes. A reasonable person would have known that Mr. McCollum's constitutional rights of protection against unreasonable searches and seizures were enshrined by the Fourth Amendment to the Constitution and that his actions were violative of such rights.

121. The acts of Defendants Urena, Melendez, and Plowick were salient in their wrongness and grossly offensive. Only an officer violating the law or who is plainly incompetent would perform such an act as forcefully restraining and tasing a subject on whom he has neither reasonable suspicion nor probable cause to detain or arrest, let alone subject to physical force. Thus, Defendants are liable to Plaintiff for the damages caused by their actions, which were the direct and proximate causes, in each count alleged above respectively, of Mr. McCollum's injuries.

## VIII.
## DAMAGES

122. Mr. McCollum repeats and re-alleges each and every allegation contained in the above paragraphs as though fully delineated below.

123. Plaintiff seeks monetary relief and for judgment of all the other relief to which he deems himself entitled.

124. Mr. McCollum' injuries were foreseeable and directly and proximately caused by the excessive force used against him.

125. Mr. McCollum is thus entitled to recover all actual damages allowed by law. The Defendants' conduct shows malice, wanton disregard, and reckless or callous indifference to his constitutional rights.

126. As a direct and proximate result of the occurrence underlying this lawsuit, Mr. McCollum suffered:

   a.   Physical injuries, including impairment;
   b.   Physical pain and suffering;
   c.   Deprivations of his liberty;
   d.   Permanent physical disfigurement;
   e.   Emotional distress, torment, and mental anguish; and
   f.   Reasonable and necessary medical care to treat his injury in the past and future.

127. Plaintiff seeks to recover reasonable attorney's fees and costs of court, and hereby requests the award of punitive damages, pursuant to 42 U.S.C. § 1983 and § 1988.

## IX.

## <u>ATTORNEY'S FEES</u>

128. If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. §1988.

## XI.

## <u>JURY DEMAND</u>

129. Plaintiff respectfully requests a jury trial in this matter.

## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against all Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiff further prays for all other relief, both legal and equitable, to which he may show himself justly entitled.

Respectfully Submitted,

**WEBB CASON & MANNING, P.C.**
710 Mesquite Street
Corpus Christi, Texas 78401
Telephone:     (361) 887-1031
Facsimile:     (361) 887-0903


By: */s/ Matthew S. Manning*
    MATTHEW S. MANNING
    State Bar No.: 24075847
    General Correspondence Email:
    matt@wcctxlaw.com
    PATRICK L. BEAM
    State Bar No.: 01955560
    serviceplb@pbeamlaw.com
    **\* E-Service Email: service@wcctxlaw.com**
    **\* E-Service is only accepted at the above**
    **designated e-service e-mail address.**

    ATTORNEYS FOR PLAINTIFF